Case number 20-1132. Food & Water Watch and Berkshire Environmental Action Team Petitioners v. Federal Energy Regulatory Commission. Mr. Carlesco for the petitioners, Ms. Chu for the respondents, Mr. O'Neill for the interveners. Good morning, Council. Mr. Carlesco, please proceed when you're ready. Morning. May it please the Court, Adam Carlesco for Petitioners, Food & Water Watch, and Berkshire Environmental Action Team. I'd like to reserve three minutes for rebuttal. This case involves the Federal Energy Regulatory Commission's failure to review the full scope of environmental impacts and the near doubling of gas capacity through the now primary delivery point for the Springfield, Massachusetts, local distribution grid. The project involves installation of a new compressor station that is significantly larger than its predecessors at a critical juncture point between one of the largest interstate transmission operators in the country and a local distributor of gas. This project was specifically designed to facilitate increase in residential and commercial burning of gas in the fourth largest city in New England. The Commission found that the large operating project would not have any significant impact and thus required no further environmental review, but it did so only because it ignored all reasonably foreseeable upstream-downstream impacts, the indirect effects underneath, which would be induced production and combustion of gas. These effects have potentially significant impacts on Springfield's air quality, public health, public safety, and of course, the global climate. And now the Commission asked this court to approve its dereliction of its statutory duty under NEPA and the Natural Gas Act by setting an impossibly high preservation standard that finds no support in the law of the Natural Gas Act or the circuit. This court should vacate the Commission's Certificate of Public Convenience necessity for three reasons. The Commission failed to take a required hard look at the reasonably foreseeable downstream impacts of increased combustion of gas facilitated by this project, despite having known upgrade capacity, known contracted volume, known purchaser, and known end use. Second, the Commission failed to evaluate the reasonably foreseeable upstream gas extraction effects of expanding transmission capacity. And third, the Commission failed to evaluate the significance of this project's emissions as required by NEPA, dismissively stating that every model available to it is fatally flawed because none is universally accepted. This is an impossible standard. So first, I would like to direct this court's attention to the downstream emissions. FERC refused to take NEPA's required hard look at reasonably foreseeable downstream gas combustion facilitated by this project. Commissioner Glick stated in his dissent to Joint Appendix 504 and 505, that because there was a known upgrade capacity, a known contracted volume, a purchaser, and known end use, and that 97% of gas use in the U.S. is through combustion, he noted that this makes a relatively easy case to determine that the downstream impacts were reasonably foreseeable. So FERC could have reasonably predicted downstream gas emissions, but chose not to. Under Friends of Capital Crescent Trail v. Federal Transportation Administration, a 2007 D.C. Circuit case, this court found that NEPA requires calculation of downstream effects when a project's capacity and transported volumes are known, even if the precise destination or Springfield local distribution grid, and that consumption will be used through commercial and residential combustion. Second, the Regulation 40 CFR 1508.8b states that indirect effects may include growth-inducing effects. Moreover, the Ninth Circuit's recognized that it's completely inadequate for the commission to ignore growth-inducing effects when a project has a potential to spur demand. In this case, both Tennessee Gas and Columbia Gas, with an advertising material, have recognized that the development of this infrastructure was specifically to address future demand and potentially lift moratoriums of gas expansion within the Springfield distribution network. This is a reasonably foreseeable growth-inducing impact. Further, the commission argues that the variability over the lifespan of this project would make this unforeseeable. However, this court has rejected this with the Sierra Club v. FERC, which dealt with a small trail project. They found there were a legally relevant cause of these emissions, where there was variability over the lifespan of two power plants that were burning gas, despite there being a variability in demand for that electricity coming from those power plants. And so, we would note that the commission also argues that they lack the authority to look at these downstream effects because they argue that they cannot deny a project due to upstream or downstream impacts. However, this court has squarely rejected that argument. Yes. On this upstream effect, one of your arguments was about sort of the glut in gas, the surplus in gas that is now out in the markets. And I assume you made that argument at the time. So, how do we know, even if there's increased demand, that it will increase production rather than use surplus? So, the standard here is that, and it's an argument we raised within our rehearing order, is that the Eighth Circuit found that if the nature of an effect is reasonably foreseeable, which would be extracted use, extraction on the whole, but its extent is not, an agency can't simply ignore that effect. In this case, the commission said that upstream impacts of extraction generally are fully unforeseeable. But moreover, this project allows for a 20-year contract agreement between Tennessee Gas and the distributor of this gas. Over the course of the lifespan of this project, the gas has to come from somewhere. And if you look at Joint Appendix 296 and 297, you'll see a map of Tennessee Gas pipelines assets that run from this project in Ogawa, Massachusetts, down through Connecticut, directly into Marcellus and New York, and directly to the Marcellus and Utica shales. The standard here is a reasonably- Does that mean that they would, sorry, I just, does that mean that they would be using, sourcing the gas from those particular fields, or- This is, Tennessee makes the argument- Or fungible ones, as in a pipeline. My apologies. So, Tennessee makes the argument that it's unreasonable for them to predict where this gas might come from, because they might be, over the course of the lifetime, for 20 years, purchasing this from other different pipelines throughout the region. But in this case, all roads lead to Rome here. The Marcellus and Utica shale is the principal development territory within the Northeast. Tennessee owns gas pipelines that run directly from it to this compressor station territory. And moreover, they make an argument that they might be getting gas from a Drockett, Massachusetts connection. If you look at the maps at 297, you'll also see that the pipeline that leads directly to Drockett, Massachusetts, on the eastern side of the state, comes from the Marcellus and Utica shales. Do you have to show things with this level of particularity? I mean, I know the FERC said, you didn't identify, you know, what new wells were going to be drilled. But I'm just trying to ask, and I appreciate the answers you've provided here, but does NEPA only kick in if you have that level of knowledge that, you know, it's going to cause a new well to be drilled, or it's going to come from here versus there, as opposed to the gas system generally, it's going to require some sort of incremental increase in the production of gas from wherever that increase may come. And it's that incremental increase in production of gas that NEPA should be analyzing. From my understanding with NEPA, it doesn't require that sort of detail. Does NEPA require the detail? It does not require that level of detail. The reason that the commission used here for this being fully unforeseeable, despite just the nature of extraction being known, is that they say that if they don't know the specific source, i.e. the specific well it's coming from, that it's not a reasonably foreseeable consequence. However, when they make this argument that Joint Appendix 389, they only cite themselves. They cite no relevant case law of this circuit whatsoever. And moreover, there are other tools that are available to other agencies in the federal government, such as the Bureau of Ocean Energy Management, the Bureau of Land Management, that are able to assess upstream impacts based upon supply and demand barriers. And this was raised with NYU's amicus brief at page 11 and 12. I know, but there's some question about whether you preserved rehearing an objection to using any particular test by FERC. So I'm just trying to get into a more general question of whether FERC asked the right question. So we specifically did raise the foreseeability of upstream impacts. And that's really the issue here is that the Natural Gas Act requires you to raise the arguments that you would be raising before this panel here. However, the specificity of it is not necessary. This court said in Consolidated Edison, a company of New York, which is a 2003 case, that it has to be brought clearly to the attention of the commission. And that's exactly what happened here. The commission addressed this ad nauseum and within their rehearing order at Joint Appendix 492. They noted that we raised upstream production issues. And the difference here between this case and Burkhead is that Burkhead made an argument that the record was fairly undeveloped, but they failed to raise that development issue within their rehearing order. We argue here that the nature of the upstream impact is known, even if the extent or particularities may not be, they still can't ignore that effect entirely. Did you make the argument that they needed to gather more information? We did not raise that argument for upstream impacts because they had a list of pipelines that would be coming from, and they had a number of maps that showed Tennessee gas pipelines, pipelines that they run into the region. So you're talking about the analysis that should have been made on the existing record? Yes. And so I'd like to turn what I view as one of the larger failings within the commission here, which is the assessment of significance. The Sierra Club v. FERC decision from 2017 state clearly that NEPA requires agencies to include a discussion of the significance of greenhouse gas emissions. In this case, the commission has categorically excluded all applied. It would exclude consideration of greenhouse gas emissions across any agency decision because they argued that there is no universally accepted methodology. This is an impossible standard here, and they raised the standard significantly higher than they did in the earth reports case in 2016. There, they argue that there's no standard methodology. Here, they're raising the bar to something that no methodology within scientific literature could ever really meet. And in doing so, they've reached the decision that this project would have no significant impacts because they categorically ignore those impacts on the whole. And we would argue too that there are tools that are available to it. The commission here has kind of put the cart before the horse and has instead argued that they need not look at this issue at all. And Commissioner Glick notes that, not Commissioner Glick, but by categorically excluding greenhouse gas significance on the project level, which is where FERC regulates the largest gas industry on the planet, at least on the transmission side, every single individual project impacts on climate change is functionally zero. And the Ninth Circuit has found that in the Center for Biological Diversity versus the National Highway and Transportation Safety Administration, that while there are a range of cost figures for greenhouse gas emissions, they are most certainly not zero. And the reason that the commission is able to reach this insignificance decision here in denying further environmental review is specifically because they completely mark all greenhouse gas emissions significance as zero, despite doing no commission speaking out two sides of its mouth and saying that this is insignificant, while also refusing to do any sort of significance assessment here. Additionally, I'd like to raise the issue of segmentation here. Under this court's precedent, Sierra Club versus Army Corps of Engineers, to show that segmentation has occurred, you have to demonstrate contemporaneous construction schedules, closely related utility, and interrelated nature. In this case, we meet all three. Both the 261 upgrade project compressor station on the west side of the Connecticut River and the Longmeadow metering station on the east side of the Connecticut River are built in tandem. The metering station was constructed first. And while a metering station can be installed without additional capacity, this was specifically designed to anticipate the additional capacity that's facilitated by this compressor station. And the compressor station and Longmeadow have overlapping construction schedules, and their utility here is to move additional gas capacity into the Springfield distribution grid. They are both supplied this gas under the same contract agreement between Tennessee Gas and Columbia Gas distribution. The Longmeadow project has independent role, independent utility that it's serving, and that it would go forward with or without the 261 upgrade. Now that's at least a relevant consideration in the segmentation analysis, isn't it? You could technically build a metering station without a compressor station, but when you're building it to anticipate the increased volume that's facilitated by a compressor station, the independent utility of it is de minimis. It would really just be, because a metering station is meant to measure the volume and flow that would be coming through it. If you aren't increasing the capacity of what is being pushed through it, then it doesn't need to be upgraded to a meter that increased capacity. So they have similar utility here. They're meant to work in tandem, and as this court said in the Delaware Riverkeeper case, in that this is, what's the quote, they are meant to function together seamlessly, which is exactly what happens here. Moreover, both Tennessee Gas and Columbia advertise this as addressing interrelated challenges for needed additional capacity. With that, I see that my time is up, unless you have further questions, Your Honor. Okay, thank you, Mr. Carlesco. We'll hear from, for counsel now, Ms. Chiu. Good morning, Your Honors. Susanna Chiu for the Federal Energy Regulatory Commission. In this case, the commission made a record-based, fact-specific determination that this particular reliability project, designed to address local reliability needs, would have minimal emissions and minimal environmental impacts. My colleagues' arguments are not tethered to the record in this case. Going to a question that Judge Bullett asked about the standard that should be applied to whether upstream-induced gas production could be reasonably foreseeable as a result of a particular pipeline project, the answer is the standard is not relevant in this particular case. Here, the commission made a decision, it made a record-based decision, that any induced production was not reasonably foreseeable because this particular project, which involves a two-mile pipeline loop located adjacent to the pipeline, this particular project is taking gas from other interstate pipelines. That's in the certificate order at paragraphs 61 through 62, JA 389 to 90. And, of course, we have to remember that, as Chief Judge... Is it going to move more gas, or the same gas? Your Honor, first, the petitioners did not raise the specific issue, and on the record... Not raise the specific issue of what? I'm just asking a fact question, I thought the reason FERC authorized this is that it's going to move more gas. Is that a disputed fact? No, no. I mean, actually... Let me clarify. Sorry, so the question agrees that the point of this is to move more gas. No, that's wrong, Your Honor. The record shows that actually the reason for this particular contract between Tennessee Gas and Columbia Gas, the local of the Columbia system, the project was designed to serve existing customers of Columbia Gas. And, in fact, what they were doing was replacing their less reliable, interruptible service with firm transportation. I thought either Columbia or Tennessee Gas or both, most of them had said that this was going to lead to increased provision of gas. I don't believe so, Your Honor. I think that Columbia Gas actually participated as a party in the FERC proceeding and submitted some statements where they said that their existing interruptible service was not reliable and extremely costly, and they were trying to replace that interruptible service, the secondary capacity with firm transmission capacity, which would enable them to meet winter heating demands in New England region, which, as Your Honors are probably aware, is a serious issue in that region. JA113, Columbia Gas says that the additional capacity will be used in large part to serve new customers converting from oil heating to natural gas. Your Honor, I believe this is a part of the Massachusetts DPU's order approving the contract between Tennessee and Columbia Gas, but later in that same order, or earlier in that same order, rather, they talk about the replacement capacity. Well, they can do both. You can have replacement and you can increase. All I'm asking you is, this is in the record, Columbia Gas said this, and I thought you were disputing that there was going to be any increased amount of gas. Your Honor, sorry, that was the Massachusetts DPU. Columbia Gas, I believe there were effectively two reasons. There was the replacement capacity primarily, but Columbia Gas also said that to the extent that new customers would be served, these new customers would be more gas. Possibly, but the record doesn't show what portion might be new customers. The record shows that the primary reason, the driving force for this contract, was the replacement of secondary capacity. So I think if you look at the Columbia Gas statement itself, it's more clear because Your Honor, the JA113 site is the Massachusetts DPU order, which may have some statements that that appear inconsistent, but it's the Columbia Gas statement that is more clear. So did FERC find that there would be no increase in gas, the amount of gas moving through this pipeline? Did FERC make that fact finding? That's why it couldn't assess, there were no upstream effects because there was going to be no change in the volume of gas produced as a result of this The commission did not have an opportunity to make that finding. Well, it didn't make the finding, and it wasn't raised on rehearing, so it didn't have an opportunity to more closely address its finding. What I understood it to say was, you can't tell us which wells will be drilled as a result of this. I did not understand it, and please correct me if there's a fact finding that I've missed where it says we don't think there's going to be any increase in volume of gas, and that's why we don't need to analyze upstream effects. Please tell me that. My understanding from the decision was that they said, you haven't shown us which well will be dug as a result, new well will be dug as a result of this project. Right, your honor, the commission did say that. Did it say the former? Did it say there's no upstream effect because there's not going to be any change in the volume of gas? The commission did not say that there would be no change in volume, but it wasn't. Did the commission recognize that there would be some change in volume, some increase in volume? There may be, I think there may be, but there's no finding as to whether or not there would be a change in volume as a result of this particular project. Does the commission have to figure that out before it can, if it knows it has to analyze upstream effects, whether someone argues it a particular way or not, it knows it has to analyze upstream effects if it can. And so if it knows there's going, doesn't it need to first figure out if there's going to be any increase in gas? Well, your honor, the commission has to decide whether upstream induced production might be reasonably foreseeable. So the standard is the reasonably foreseeable standard, and that is necessarily a fact-based determination. And the commission reasonably found here that it could not determine whether increased production might be reasonably foreseeable on the basis of this record, because again, we're talking about a two-mile pipeline loop. And I guess I get it again, if maybe I'm, I apologize if I just missed it. Where did they say, would you keep characterizing as this is just this little two-mile thing, there's not going to be any increase? I had read their decision the same, because you haven't shown us new wells would be dug. Right. That is, I mean, that is part of the analysis that the commission generally applies, that it needs to know a source. But I'll say that in this case, it's a small project that's taking gas from other interstate pipelines. And as your honor was saying, the gas in these pipelines is fungible. There is record evidence that some of this pipeline gas might actually come from the Dawn Hub, that's at JA-66. And so whether it comes to the Dawn Hub or the Marcellus Shale, these are different sources. I mean, the Dawn Hub- But I don't understand why different sources, I'm not sure, since you just said they're fungible, it matters what the source is. The question is whether there's been an increase. Right. But well, I mean, the commission didn't know if there'd be an increase in wells drilled to supply this particular- Again, why does there have to be a new well drilled if there's existing wells that are going to produce more? I just didn't, I did not understand. I'm just telling you, I really struggled to try and understand why on earth the commission thought that was the relevant inquiry, as opposed to whether there's going to be an increase in volume, and then they will assess whether it's sort of a material one with environmental impacts. But I didn't see them even doing that first thing of, is there going to be an increase in volume? They said, you haven't shown us that a new well is going to be dug. I think it's more than just whether the well is going to be dug, Your Honor. If you look at JA-389, for example, that's in the certificate order. At paragraph 61, the commission is saying that the specific source of natural gas to be transported via this upgrade has not been identified with any precision, and will likely change throughout the project's operation. Right, that's exactly my concern. They're focused on the specific source of the gas having to be identified, and I don't understand. I think that's what I'm asking you. That seems to me the wrong question. The question is whether there's going to be a change in the amount of you know, effects. There can be environmental effects, whatever the source. I understand, Your Honor. I think that this is the standard the commission usually applies, that it needs to determine a source, and it needs to be concrete. I think that's the commission's understanding in using this standard. But I will say, I don't think it's- That's all the- unless a specific source of gas is identified, then you don't have to analyze upstream effects? Is that how NEPA works? Anyway, is there any case that says that? Your Honor, the commission has been upheld before on its analysis of upstream impacts. The specific source inquiry? I'm not sure, Your Honor. I could find out and submit a letter if you would like that. If you have a case where we've said that there's no obligation to analyze upstream effects unless in a gas context the specific source can be identified, that would be of interest to me. I couldn't- I didn't find it, but I might have missed it. I understand- Given the fungibility of gas, it would seem- it seems an odd inquiry to me. Let me look into that, and we will submit that information to you. But I'll say that I don't think that that- we'll look into it, but that standard isn't determinative in this case. I mean, in this case, there's just no record evidence of induced additional production that could be reasonably foreseeable as a result of this particular pipeline. Can I ask you about downstream effects? Sure, Your Honor. We should talk about, you know, you don't have enough information about end use. And if I read the record correctly, the day before it issued its environmental assessment, the commission asked Tennessee Gas to provide more information about the downstream- the intended uses. Right, Your Honor. And then it issued the environmental assessment without waiting for Tennessee Gas to respond, because they only asked the day before. So how can the commission then reasonably say it lacks sufficient information about the end use if it waited until too late to ask Tennessee Gas for that information? Is that behavior by the commission? I think- I think the commission did at least then- in that case, the commission had the response before it, in advance of the certificate order and the rehearing order being issued. Even if it was- But it already made the environmental assessment, and so there's not going to be an environmental consequence. We can't- we can't figure out- we don't- we haven't identified any material downstream consequence. It didn't revisit the environmental assessment in the certificate order, did it? No, I don't believe so. But it could have. It could have, Your Honor. And, you know, any responses received before the certificate order issued, before the rehearing order issued, the commission could have addressed any change that would be warranted by the response. But I think it's important in this regard to note that the commission made the inquiry. It asked Tennessee about the ultimate end use. It wasn't just one data request. It was actually two data requests. Actually, Your Honor, I'm- there are two data requests, and I'm sorry, I'm not sure which one now that you're referring to, but there is one issued in December of 2018, and then there was the other one issued in May of 2019. JA-175-77. It just struck me as quite unusual to see an agency ask for information that's critical to evaluating downstream effects the day before its environmental assessment, and then not wait for a response before doing it. I don't think I've ever seen that before. Well, I think, Your Honor, that was the second data request. Data that they thought was relevant to evaluating downstream effects or not? I assume they asked because they thought it was relevant. It probably was, but it may have been, you know, it may have been additional information that came up as staff was preparing the environmental assessment, and if it- They issued the assessment the next day. Right, but they could have changed- they could have supplemented the assessment if the answer changed their minds about something. And that was, again, that was the second data request. The first one was issued December of 2018. Yeah, the first one, you didn't get much response from Tennessee Gas. I think that's why you did the second one. What more do you need to assess the downstream effect here, right? You know there's going to be upgrade capacity, you know exactly what it is, you know the producer, you know exactly who the end users are, and you know that 97% of gas is combusted. What additional piece of information was needed and was missing to make an educated estimate of the downstream effect here? Well, Your Honor, the Commission found that it didn't know the ultimate end users, you know, the specific end users, because Columbia Gas is a local distribution company, and it has different kinds of customers, has different classes of customers. Some may purchase gas from marketers rather than directly from the distribution company. You can make estimates. I mean, it can't be the downstream effects are only analyzed when you have, you know, customer-by-customer, individualized reports on usage. We were pretty clear in the Sebald Trail case that educated estimates are done here, and it seems to me it's not going to be many cases that you're going to have this sort of closed set of how much is coming, and we know exactly where it's going. Right, Your Honor. I mean, of course the agency can make educated estimates, and it does, but in this particular case, petitioners did not ask the Commission to make specific estimates on rehearing, and the argument was not raised with specificity to the agency, and specificity is required. Doesn't the agency have to make, at some point, kind of do its own job and say, if it says we can't, if it said we can't analyze downstream effects on this record, and they said yes, you can, that disputes before us, and they have to have a reasonable explanation for why they couldn't do it, and to say that, well, there could always be more information doesn't seem to me responsive to the question of whether you could have made an educated estimate on this record, Well, Your Honor, the Commission always, it can make estimates, but I guess in on this particular record, an educated estimate here, but it, well, I think the agency decided that here, it wouldn't be meaningful to make estimates, or that perhaps it wouldn't be a truly educated estimate because of the specific facts of the case, and we have this local distribution company that's subscribing to this project for replacement capacity, and we have people transitioning from oil heat to gas heat. There are specific facts in this case that make it appear that an estimate would not be meaningful. Why? First of all, the answer earlier was that this really isn't about people transitioning from oil to gas. If they are, that'll be a small amount, so you can, that can certainly be addressed through mathematics and the adjustment, and if you know you're going to have increased capacity, you know where it's going, you know it's going to be burned to be used for residential and customer usage. Again, we're not, we're looking for educated estimates here. We're not looking for pinpoint precision. Right, Your Honor, I think that the record is just showing that there may not be an increased, there may not be increased consumption here because we're replacing what, you know, we're replacing a certain amount of capacity with another, you know, the same amount of capacity, just more reliable capacity. That's just in the record, and the commission decided that it just, it wouldn't have been meaningful to make an estimate in this particular case. Can I just ask, in the petition for a hearing, the following sentence appears. It said JF-468, FERC cannot ignore the fact that adding firm transportation capacity is likely to spur demand for natural gas, and for that reason the commission must at least examine the effects that an expansion of pipeline capacity might have on consumption and production. So doesn't that flag the necessary question, because I thought part of your response was that the commission wasn't put on notice in the petition for a hearing of the need to look into this, and it seems like that's what's being asked here. Right, Your Honor, I think that's a, it's a generalized argument. It doesn't, that particular argument doesn't, for example, ask the commission to do a full burn estimate. I mean it's, that's a very, a generalized argument that it doesn't engage with the facts of what the, what the commission was doing in terms of the data requests. The data requests are not mentioned in the rehearing request, and the commission's conclusions based on the data request was not challenged on rehearing. So that's where, if the commission had been alerted with specificity that its interpretation of these data requests was on chat, was being challenged, then the commission could have addressed it more specifically in the rehearing order, but we didn't have that opportunity because it wasn't raised on rehearing, not specifically. Can I ask you, with regard to downstream effects, why do you even need to know the end users? And I assume as a matter of science, there's just some equation which tells you that when you burn a cubic foot of natural gas, you're going to get a certain amount of carbon dioxide or whatever, and that won't change depending on whether the person burning the gas is an individual home for heat or a power plant or whatever. So what does it matter who's burning the gas as long as you know how much gas is going through the pipeline and the overwhelming majority of it will in fact be burned? Well, your honor, I think it depends on the facts of each case. There may be the broad general estimate that 97 percent of gas that is transported is consumed, but some gas isn't consumed. I mean, local distribution companies sometimes release excess capacity. There are cases where the gas is not consumed, and so I think the commission's view is that it needs more information about the burning of the gas, at least the commission's view, as reflected in this order. What else would you do with the gas other than burn it? Does it have any other use? Not that I'm aware, your honor, apart from selling it. I mean, I guess one could resell it if you're a marketer or a local distribution company. I mean, that would be the other use that I can think of. Does FERC dispute that 97 percent statistic? Not that I'm aware of, your honor. I don't know that it was addressed in the order itself. I don't think the order itself addresses the 97 percent statistic, at least not the know the statistic, and so they could just discount any number by three percent if they felt they needed to. That would seem to be part of an educated estimate. That is possible, your honor. I don't think that it was necessary to do that on the record of this case, but that's possible, your honor. Because why wasn't it necessary? Well, I think on the record of this case, because we're talking about a project where there are specific findings that the project itself would have minimal emissions and minimal environmental impacts. The finding of minimal environmental impact was after they said we can't figure anything out, so that seems less helpful. Well, that was based on direct emissions from the project. Can I ask one other thing, and that is what's the status of this project? I'm talking about the 261 upgrade here. Is it completed? Is it already providing in service? I know there was a construction order. Is the construction still underway? Yes, your honor. I believe council for the pipeline will also have additional information, but my understanding is that the pipeline loop is complete and in service, and the compressor station upgrades have been delayed because of the pandemic, but I believe that that's in process. Okay, so this new compression system is not up and operating. I think so, yes. Unless my colleagues have further questions for you, we'll hear from intervenors. Council, thank you, Ms. Chu. Thank you, Mr. O'Neill. Mr. O'Neill, you're muted. Thank you, your honor. May it please the court, I'm Brian O'Neill. I appear on behalf of the intervenor Tennessee Gas Pipeline Company. We've filed a joint brief with the other intervenor, Columbia Gas, and to respond to the questions that have come up. First of all, the status of the projects, Ms. Chu got it spot on. The 261 looping, the two miles of looping is complete. However, the compression station upgrade has been delayed primarily because of pandemic-related issues. I begin by saying this. First of all, this is a reliability project. I apologize. Can I ask one more just fact question? Sure. Is the Longmeadow meter station, is that completed? That is not completed. It will be completed later this year. Once again, it was delayed because of the situation. Sure, I apologize. Go ahead. That's all right. This is a reliability project and we can't lose sight of that. It's a relatively minor project from Tennessee's perspective, but it's a critical one for Columbia Gas. It's a replacement capacity issue with them. While it's new capacity, certainly off of the Tennessee system, it's replacing capacity on the Columbia Gas system that they have been using secondary point capacity, which is interruptible. The new capacity is firm. They can rely upon it year-round and don't have to have any concern about it being interrupted. In addition, they are replacing antiquated propane peaking capacity, which is not as useful and operationally, it's not as good, and it is more costly. With respect to your reference of the statement at JA113, Judge Mellick, that is a statement that was made by the Massachusetts Department of Public Utilities. The statement in the record on behalf of Columbia Gas is at JA87. It's quite clear that the overwhelming majority of this capacity is necessary to replace the capacity that I just described, the unreliable interruptible capacity. They have firm capacity. It has to absolutely be there when they need it. That's correct. Is there going to be any increased capacity or not? Any increased capacity moving through this to the extent that there's no increase in the, as I understand, no increase in the demand or even in supply as far as we know from Columbia Gas's perspective. However, there may be the ability to reconnect or to have additional connections where there are customers who are switching from fuel oil. The way we view it from the standpoint of greenhouse gas emissions, that it's either a wash or it's a benefit. There's no detriment here from the standpoint of emissions. Finally, I'd point out- My question wasn't about emissions. My question was simply increased volume of gas moving through this project than you had before. Are you able to move and expected to move more gas? I don't know how you can have a firm, reliable, can meet a firm commitment. There isn't- And you have it there. That's correct. As I said, this is additional capacity from Tennessee's perspective, but from Columbia Gas's perspective, it's replacing unreliable capacity. In that regard, from Columbia Gas's perspective, it's a wash, at least from the standpoint of their gas needs. From Tennessee Gas, it's an increase. Pardon me? From Tennessee Gas's perspective, it's an increase in the volume. It is, indeed. Tennessee Gas is happy to have the business. Also, very quickly, the Council for Petitioners referred to a pamphlet at JA-296 as being an indication that there was increased demand here. If you take a look at that pamphlet, you'll see that the reference that the Council is referring to has to do with something called the Alternate Backfeed Project to serve a different market, the Northampton market, and that project has not gone forward. Thank you, Mr. O'Neill. Let me make sure my colleagues don't have additional questions for you. Mr. Karlesko, we'll give you your two minutes for rebuttal. Thank you, Your Honor. First, I would like to address the increased capacity. Commissioner Glick acknowledged that this contract increases about 40,000 decaturms a day over prior agreements with Columbia Gas. Moreover, Tennessee and FERC make the argument that because this is replacing oil heating within the area that they could somehow disregard this, but this court directly admonished the commission for that same position in Burkhead at page 591. It said that if downstream greenhouse gas emissions are otherwise an indirect effect, the possibility that a project's overall emissions calculation will offset somewhere else does not excuse the commission from failing to do estimates in the first place, and that's exactly what we're seeing here. Additionally, I would like to touch on the commission's argument that this is solely a reliability increase. It is a reliability increase in that it increases the amount of area. The issue with their reliability is that the pipeline capacity is constricted, so they increase the capacity so they can get more gas flowing through there. Moreover, Amicus American Gas Association acknowledges that this is very much an if-you-build-it-they-will-come approach, and Food and Water Watch addressed that at Joint Appendix 462. They say that gas distribution companies will employ detailed long-term supply agreements that meet reasonably expected future demand. This is very much meant to anticipate additional growth. They also state that this is a prerequisite for increased gas expansion through their distribution network, so this is very much seen as an additional capacity. Moreover, we ask this because we see this as analogous to your recent order at Standing Rock Sea Tribe versus Army Corps of Engineers, and that this is an inadequate, neeper view of a pipeline with glaring deficiencies that would lack the disruptive consequences, and vacature would address the seriousness of the order's deficiencies. This is a standard that the court employs. An allied signal would be NRC, DC Circuit case from 1993. With that, I request that you vacate the order, and thank you for your time. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Millett, Katsas